In session, you may be seated. Please shout the 19-10214 Johnny Melvin v. Barr Roofing Company. Yes, Jenny Knapp. I'm here on behalf of the appellant, Mr. Johnny Melvin, the sheet metal worker and former employee of the Appley Barr Roofing Company. There are very few facts in this case that the parties actually agree on. One is that Mr. Melvin is black. Another is that he was terminated. But the events and circumstances leading up to that termination and the motivations behind it are hotly disputed. And for that reason, summary judgment was not appropriate. And we ask this court to reverse and remand for trial. Melvin reports that he endured years of racial harassment and being called many names while he worked at Barr Roofing Company, ultimately culminating with a death threat made against his life because of the color of his skin and his termination from the company. On April 28, 2017, when he was riding back from a job on a Friday afternoon with other members of his crew, who notably were all white, they began picking on him, threw his tools out the window of the car, refused to turn around to go get the tools when he asked. And then one of the men, a white man named Lee Cedar, who was a big man, intimidating, lots of tattoos, started to refer to white supremacy. And I'll paraphrase what he said for the sake of decorum, but he threatened Mr. Melvin, said he wouldn't hesitate to beat him up, and that he would throw his black self off the roof the next time that he got a chance. And Melvin took this, understandably, as a threat on his life. He was scared. He reported this incident the next business day, which was a Monday morning on May 1. He reported it to the vice president of the company, Bryson Galloway, and he was terminated eight days later. Counsel, so you want to reinstate the 1981 claims and Title VII discrimination and retaliation and hostile work environment also? Is that the universe of claims? That is the universe of claims. That's correct. So Mr. Melvin brought retaliation claims under Title VII in 1981. As the court knows, the first element of the prima facie case would be whether he engaged in a protected activity. We say that he did because he reported this event of the racial harassment. He continued to report it during the eight days in between the first report of this death threat and the time that he was terminated. Mr. Galloway tells a different story. He says that, well, Mr. Melvin reported the tools being thrown out the window, but he didn't report any kind of racial connotation to that conversation. But Mr. Hawkins, who was Melvin's supervisor, says, well, no, Mr. Galloway told me that there was a racial component. He said he reported a, quote, racial slur or something like that. And so this to say this is one of the issues that the parties disagree on, that there is a factual dispute about this and many other things. Another one of the factual issues is the causal connection between the protected activity, making the report, and the adverse employment action, that being him being terminated. As Judge Haynes pointed out in an earlier argument today, the temporal proximity between those events is something that the court looks at here. It's a span of only a very short amount of time, as a matter of days. The courts recognized in the Evans case, which we cited in our brief in that case, there was five days between the events. But that case recognized with favor a lower court opinion, citing that as much as four months can be time enough to show that those two events were linked together. More recently in this case was decided after the briefing in the instant case was completed. I'm not just saying you don't like snitching. Well, absolutely, Your Honor. It ties everything together a bit. Absolutely. You have a fact from the direct supervisor telling Mr. Melvin the day after he made his report that he didn't like, quote, no effing snitches. And then the day before he was terminated, Mr. Melvin showing up to work reporting to his supervisor and him acting shocked that he's here and saying, what are you doing here, you don't work for me anymore, you're an effing snitch. And so absolutely that is evidence of the retaliatory motive in the termination, and we believe is certainly enough to get past the prima facie case, but even to show that the proffered reason for the termination was nothing but pretextual and there is absolutely a racial motivation behind the termination. The proffered reason is the failure to take a drug test? Correct. So Mr. Melvin made this report on a Monday morning. He was sent back on Tuesday morning is when the first snitching comment was made by his supervisor who then kicked him back to work at the shop for the day. And that incident precipitated Mr. Galloway, and his story is that he called Mr. Melvin in to his office and asked him to take a drug test on Thursday. Mr. Melvin disputes this, another fact issue. Mr. Melvin says no, he didn't ask that morning. He was then sent home on Thursday, and Mr. Galloway called him that afternoon and said, why didn't you show up for a drug test? And Mr. Melvin was just shocked because he hadn't heard anything about it. Is that a reason for the straight discrimination claim? You articulate well the retaliation, but I'm trying to deal with the discrimination. Sure. And so on the discrimination claim, there are really the only element in dispute is whether he was treated differently than a white employee. Does he have a similarly situated employee? We would say that yes, he does. Bar roofing company has said, well, Mr. Melvin didn't follow the drug and alcohol policy because he didn't show up for this drug test. And we would say, well, there are white employees, at least one that we know of, that did not follow that drug and alcohol policy either and who was not subject to. But he did show up. A claim with him is that he substituted someone else's body fluids for his, but he took the test or at least appeared to take the test. So how are those the same? So he did not follow the drug and alcohol policy because he didn't submit his own sample, and so that doesn't follow the policy. Mr. Galloway knew about this. He had been informed of that by Mr. Melvin, and Mr. Hawkins testified to that in his deposition, and yet nothing was done about it. And so you have two employees who both violated the drug and alcohol policy in that first instance. One is Mr. Melvin because he admittedly failed it, and then Mr. Hawkins, Ezzie Hawkins, because he didn't submit his own sample. But that didn't cause the firing. I mean, he was not fired after that. He was asked to take another drug test. There's no indication that a non-black person was asked to take another drug test and refused to and was retained, whereas Mr. Melvin was fired. And so the discriminatory animus is shown in the fact that the white employee wasn't even asked to take that second drug test, not with respect to the fact that Mr. Melvin may or may not have been actually asked to take the test at all. Does that fact matter? I think it does because it shows that the bar roofing is making up a reason for the termination, that their stated reason is not a real reason. Can you send it back just because there's a fact issue on whether he was ever asked to take, or could that be an error by the employer which we don't look behind? Can you send it back just because there's a fact issue on that? I think it goes to the pretext of the reason for the discrimination, and I do think that's an important issue. Mr. Galloway says in his affidavit, well, when employees fill the drug test the first time and they are subject to the second drug test, see the drug and alcohol policy. But if you look at the drug and alcohol policy, it doesn't have that anywhere in there. To Judge Elrod's point, we have a lot of cases that say if you got the facts wrong, that doesn't mean that that was pretext. In other words, if I thought you were late to work because I looked at my watch and I thought it was 9 o'clock and it was really 8 o'clock and I decided to fire you for being late, that's not a pretext. That's a mistake. That's not a pretext. It might be a breach of contract if we had some contract about it, but it's not a pretext because I'm messing up thinking you're late, but I'm firing you because you're late. Well, and I think we go back to look at the proximity between these events. He made the report of the racial death threat against his life. When Mr. Galloway called him back in his office later that week, he again reported he was being harassed because of his race. When Mr. Galloway called him in the afternoon. That's a separate point. I'm just talking about the notion of pretext for discrimination. You're saying that not following your policy shows pretext, and we have case after case that's to the contrary of that, that not following your own policy is not a demonstration of lack of pretext. So, well, I think the analysis. Lack of a reason. Lack of a valid reason. It's not evidence of pretext. On the discrimination side. And that's not the only evidence that Mr. Melvin was treated differently than a white employee either because there's evidence in the record that he asked for a pay advance and was not given it. They say this is because the company policy was that they're not giving pay advances anymore, but there's also evidence in the record that a white employee, Ezzie Hawkins, was given a pay advance after that policy was instated. And then there's also the issue of a raise, which Mr. Melvin was denied again. Ezzie Hawkins was given a raise, and that was a white employee. And that's the reason that bar roofing has raised now after the lawsuit was filed. At the time, what they said was we're not giving raises to anyone, we're not giving advances to anyone. And so I think the fact that they're changing their story also calls into question the motivations behind the reason, the treating of these two different individuals, and why were they treating these individuals differently. If you look at the totality of the circumstances, as the court should in the pretext case, we have years of Mr. Melvin reporting and being called the N-word on a daily or near-daily basis, being called boy, being called Johnny Boy, all of these derogatory terms that he had reported to his supervisors, and nothing had changed. So what's your best case for . . . they have some evidence in the record that they allegedly talked, that Galloway talked to the people who were making these inappropriate, terribly inappropriate comments allegedly. What evidence do you have, I mean, what case do you have that says that that's enough for hostile work environment? As long as the supervisor says stop, but they continue, what's your best case? And so while the evidence says that on one occasion, Mr. Galloway says, and Mr. Hawkins, the supervisor, says on one occasion he talked to the employees and said, y'all quit doing that, Mr. Melvin's testimony is different. He says that he reported this, I don't remember if he says weekly or monthly, but it was on a regular basis, and that Mr. Galloway would come and say, has anything changed, and he said no. Okay, well then still nothing changed, and nothing was done. And so there was repeated reports. It's not just one instance, and there's only evidence on their end that something was done once. I think Mr. Melvin would dispute even that, but even that is not enough. So this is your position that the case law says that you must use escalating methods if it's not getting taken care of and it's still a problem. The idea that the employer must continue to try something new if it's not working, just the one talking to. I think they should do something more than just the one talking to for that. I can't think of one off the top of my head. Your position is they're not entitled to the Ellersberger immunity on that? I don't think they're entitled to immunity, no. When he did make the reports to his supervisor, he would just say, well, it is what it is, or we call it like we see it. There's also evidence that the supervisor was involved in the name-calling itself. I think it's also important to note that it's not disputed that the snitching comment was made, that Mr. Hawkins told Melvin, you don't work for me anymore, I don't like snitches. That's not in dispute. I think that's telling as to the reason that he was terminated and the reason that actions were taken against him. I think in sum, I think there are quite a few fact issues, and I think this case is ripe for a jury trial. Thank you. Thank you. We have your argument. And you've saved time for rebuttal. May it please the Court, Counsel. My name is Jessica Hale, and I represent Barber Roofing Company. Appellant is attempting to avoid summary judgment by muddying the waters with inadmissible, misleading, and immaterial facts to cloud the issues. The reality is that there is no evidence to support Appellant's claims for race discrimination or retaliation under Title VII or Section 1981, and this case is ripe for summary judgment. Okay. Do you currently maintain the position that his 1981 claims are preempted by Title VII, or have you abandoned that preempted position? Your Honor, I've never maintained that position. My motion for summary judgment never argued that. The district court put that in its order, but that was not argued by Barber Roofing Company. Barber Roofing Company said that's — I recognize that's incorrect. I do, Your Honor. But this court — What about the but-for causation? Do you recognize that's incorrect? It's not but-for. With regard to Section 1981? Yes. On the Section 1981 claim, the dismissal can be upheld on the grounds that were presented in our motion for summary judgment. The grounds that we presented in our motion for summary judgment were that the legal analysis and legal framework for a Section 1981 claim is the same as a Title VII claim, and because these claims — It's not but-for in Title VII either under our Garcia v. Professional Contract Services. Under the cat's paw theory of liability, there is a requirement for but-for causation. That's what they're arguing. So with regard to the retaliation claim, there is no proof of causation. What appellants have argued in their complaint was that there is this short temporal proximity of events and that because there was a short temporal proximity, there is causation. But they are not linking those events or giving credence to the fact that there are intervening events that would be considered superseding causes. By their logic, we could step back and say, well, but for the fact that appellants chose to smoke marijuana and failed his first test, he would not have been asked to take a second drug test, and he would not— But but-for is not the requirement. Under the cat's paw theory, they have Dixon v. Morby-Wallace, Inc., that says temporal proximity alone is insufficient to prove but-for causation, and that that's what the requirement is for the cat's paw theory. The cat's paw theory of liability, when they're trying to impute— Yes, the Court's very familiar with what cat's paw is, but go ahead. Even if it isn't a but-for causation requirement, they're trying to impute retaliatory animus on a prior agent, on Eric Hawkins. The appellant testified that Bryson Galloway always treated him with respect, that he has no complaints with the way that Bryson Galloway, who's the ultimate decision-maker, treated him. So going back to they're now trying to argue that Eric Hawkins had the retaliatory animus. Well, to establish that the earlier agent had the retaliatory animus, they have to establish that he intended appellant to be terminated as a result of his write-up if that wasn't in fact a— Didn't he say so? I'm sorry? Didn't he essentially say so? You're a snitch. You don't work for me anymore. I mean, how much clearer could it be? So even if that is—even if there is a retaliatory animus there, he has to have intended the ultimate result there of his being terminated. I think there's evidence that he wrote him up and he wanted him to be reprimanded for it, but there's no evidence necessarily that he intended for him to be terminated as a result— Well, there's no direct evidence in that circumstantial evidence, certainly at some redressment stage, to say we've got to go further. Well, but for the cat's paw theory to work, the appellant would also have to establish that the ultimate decision-maker basically rubber-stamped that write-up, and there's no evidence that Bryson Galloway even considered the substance of the write-up in making his decision to terminate the appellant. He instead asked him to go take a follow-up drug test, and then an appellant didn't show up for that drug test. This is why I made you fit in all of this, because this is all very close in time. It is. He's a snitch on day one, and a few days later he's being told to take a drug test. Oops. Let's have him take a drug test. Sure, but there's also— None of this really smells too good. Well, there's also intervening circumstances here. On May 2nd, he came in and complained about the Lee cider incident, and that incident is separate and apart from him cussing his supervisor out on the job, which got him sent back to the shop to work for the day, which brought him into Bryson Galloway's office and had him looking at the personnel file. Is there a dispute at the core of all of this that happened? I don't know that it's disputed that he admits in both his deposition and in his affidavits that he cussed out his supervisor. In response to? In response to being called lazy, but for— and he also says in his complaint that he was called lazy on a daily basis, and there's no evidence that he was written up on a daily basis. So the distinguishing factor there is that he cussed him out in response to that, and that's what got him sent to the office. He wasn't written up on any other basis. It was that I was lecturing him about being lazy. Cussing is a new fact. So the supervisor calls him out on that, which means he knew about it and means he was upset about it. But the supervisor has no decision-making authority over his employment. Why isn't all of this temporal proximity, the snitch, the fact that he knew about it means he's talking to Galloway, why isn't that some evidence? I mean, it's a rare day in these discrimination cases where somebody just walks in and goes, sure, I discriminated, sure, I retaliated. It's always circumstantial. There's nothing linking Galloway's decision to Eric Hawkins' write-up. Galloway independently, the case law says that a superseding cause would be something that would be unforeseeable to the person who has a retaliatory animus. There's no allegation that Bryson Galloway had a retaliatory animus. That's what they're imputing onto Eric Hawkins. So they have to link those two individuals to get to that causation there, and there's no evidence linking those decisions. This Court's held that when there is an independent investigation and the ultimate decision-maker does not take into consideration or even partially the actions attributed to the retaliatory, the person with the retaliatory animus, then that's a superseding cause that defeats causation. Counsel, let me ask you, are you basically saying that because plaintiff had not had a random admission by either one, they needed to take the depositions of Hawkins and Galloway and say did you talk to each other? Absent that, the mere circumstances that Judge Haynes is talking about are not enough to get you past a need to say there's no genuine dispute of material fact. Absent those depositions, there is no legitimate dispute. There's a lot of smoke here. Without you having to agree to that. Let me say to me it looks like a lot of smoke, and not that you're blowing smoke, but there's a lot of concern here about what really had gone on. So what would have been necessary in your view, under the case law you're talking about, before summary judgment had to be denied? All he's got is temporal proximity. No, we've talked about other things. He's got more than that. He's got the fact that the supervisor wants him gone and won't work with him anymore. He's had the various incidents that you say are not relevant to this and we'd have to decide whether they are relevant. It's more than just timing. Well, you'd have to establish that Bryce and Galloway, the ultimate decision maker, was influenced by that, and there's no evidence of any influence there. That's what I'm asking you then. You haven't responded. You're saying you've got to ask Galloway in a deposition to get him to admit it? I mean, it may not have happened. I'm not saying it did. Right. But absent something like that, the mere circumstances aren't enough to deny summary judgment? No, Your Honor, I do not think they are. There are a lot of facts that have been raised in their response to motion for summary judgment and their supplemental brief that were not in the complaint. In fact, this snitching comment is not in their initial complaint at all. We're on summary judgment. I understand that. I'm sorry? Yeah, they don't. I understand that they don't have to plead every fact, but when you're talking about that is the basis for their retaliation, that is their key fact saying that that shows that Eric had a retaliatory animus, that's not in their complaint. Their complaint mentions nothing about that. So when it comes to retaliation, our motion for summary judgment in addressing the retaliation, there's nothing in the evidence that would link Eric's alleged retaliatory animus against the appellant. He didn't have any authority to hire, fire, to change his job circle. He laid the information to Galloway. And Galloway did not act on that information. We don't know whether he acted on it or not. What we know is that Galloway asked him to take a follow-up drug test and that appellant did not show up for that drug test, and he was terminated for violating complaint. He didn't know about that drug test, so that could be a pretext. He got the thing from Eric. Eric says, I'm not going to have him work on my team. So he says, oh, I've got this guy, and I don't have a team for him to work on, and so we're going to set this drug thing up. And he doesn't know about the drug test, and so he's fired when he doesn't know about the drug test. We have to take that fact in that way. But that fact, all that would tend to prove is that there was a misunderstanding, as Judge Haynes says. No, it could be a setup. It could be intentionally that they knew he didn't know about the drug test. But that would have to establish that he was being set up by Bryson Galloway. And, again, he testified that he has no complaint with the way that Bryson Galloway treated him because Bryson Galloway is the one who's ordering him to take that drug test. Eric Hawkins had nothing to do with the drug test. He didn't mention a drug test. He's not talking about when he says he has no way about treating him. He's not saying that Galloway made racial comments about him. But he's the decision maker, and he is saying that he was influenced by these other people. And so if he's influenced, it doesn't matter whether he's a good person otherwise. He's influenced by the people that have the retaliatory animus. I don't know that there's any evidence in the record that there was any influence when the reason for the termination was that he failed to show up for a drug test, which he failed. He says he didn't know about. So that's suspicious on its own. Well, and there is evidence in the record that Bryson and another employee in the office heard Bryson tell him to go take the drug test, that at that time he said he didn't have a ride. Bryson offered to take him to the drug test, and he said, no, I'll find my way. Is there anybody who says he didn't know about it? Yes. The plaintiff does. So it sounded like a factual dispute. But I don't think that's material. I don't think it goes to the ultimate issue. Even if he claims he didn't know, which his complaint says that he was actually told for the first time to go drug test when Bryson called him in the afternoon, and then he changes his story and says, well, Bryson's asking him, why did you not go drug test? So, I mean, the appellant here has changed their story several times throughout this. Counsel, let me ask you, what is your evidence as to why the drug test was requested, ordered at that time? So when an appellant first, when he failed his first drug test, the company policy is to give him a second chance, and there to be tested no second. I'm talking about there needs to be one. Why that day was there a request for a drug test? Because that's when Bryson Galloway pulled out his personnel file and saw that Trinity drug test document that's in the record that says he's due for a second follow-up drug test. And he was reviewing his personnel file because he was in his office for cussing out a supervisor, and as Bryson Galloway testified, he was trying to figure out what was the basis for what was going on, what could be done. And so he naturally pulled out the personnel file at that time. Can you address the hostile work environment claim, please? Yes. The hostile work environment claim was not properly before the court. This court actually has held in Roberts v. Lubrizol Court that a claim which is not raised in the complaint but is raised for the first time in a response to motion for summary judgment is not before the court. And Roberts in that case used terms such as harassment and hostile work environment and said that this court said that the complaint, this general language, is insufficient to properly state a claim for harassment, whereas here the plaintiff expressly clearly laid out two causes of action, one for discrimination and one for retaliation. In this case, the complaint at the end of the factual allegation says that the plaintiff was terminated for racial – the motive for the termination was racial discrimination and retaliation, and then listed two counts, Title VII and Section 1981. Right, but the complaint says supervisors and employees engaged in discriminatory practices against plaintiff on the basis of his race, including but not limited to engaging in a pattern and practice of harassment and humiliation of plaintiff using racial slurs and epithets directed toward plaintiff, and then it goes and lists some of them. That is a statement of a hostile work environment claim, even if it doesn't say in a separate thing hostile work environment. Well, and in fact, the complaint never does say hostile work environment. It doesn't have to. I know it doesn't have to. This court said specifically that general terms of harassment and hostile work environment alone are insufficient to get you a hostile work environment claim. It's not the magic words. It's what he pled, and he pled elements of a hostile work environment. Even if he pled a hostile work environment claim, the district court considered that, and his testimony and his deposition would negate that claim because it has to be so hostile and it has to be so severe and pervasive that it would affect the term or condition of his employment, and he testified that it just made him mad, and this court has held time and time again that just making you mad is not sufficient for a hostile work environment claim. So he was not fired for lashing out at his boss. There was no allegation. But if we follow that logic, then where does it stop? We can take the initial point as far back as when he initially chose to smoke pot. Then that, I mean, there's always a chain of events that leads to this. So I think looking at temporal proximity alone, and just like you're mentioning there, is a dangerous, slippery slope that gets us very far back to the point where we can say, well, but for his own decisions and his own actions, he decided to smoke pot and failed the test. He chose to cuss his supervisor out on the job. I'm saying it did. That's part of why he did smoke pot was to try to fit in. That's his own testimony. But his own testimony. Because he's being treated so hostilely because he is of a different color than everyone else. That seems to be affecting him. So, you know, you might not think that something affects you, and yet you are acting differently than you did before. And everybody goes, yeah, you're acting differently. So what affects your job is not as simple as you're making it seem. Taking his own deposition testimony at face value, he said it did not affect a term or condition of his employment. It just made him mad. He said that he was working fine and that his performance was as good as anyone else's. He's saying he's working well. He can still work. That it did not affect his ability to do his job. That's a different question. A term, condition, or privilege of employment is different than can I do my job still. But this court said that a term or condition of employment is the way that you analyze whether or not it affects a term or condition of your employment is whether or not it affects your ability to do your job. The fact that someone is really strong and can overcome and still do their job doesn't mean they don't have a hostile work environment claim. But can I, you concede though that it's sufficiently severe or pervasive, correct? You're not arguing that it's not sufficiently severe or pervasive. I'm arguing that his deposition testimony would negate that claim based on his testimony that it did not affect his ability to do his job. That's the only basis, right? You're not arguing anything else about hostile except you don't think it's plaid and then you don't think that and the fact that he could still do his job. You're not, you concede that it's plaid and that there are facts in the record that sufficiently severe or pervasive, correct? No, my argument is that it hasn't been plaid and that he's negated that element of the case. Right, but do you concede that it's sufficiently severe or pervasive? No, and Your Honor, his complaint stated that it started in 2017. Then in his affidavit, in his brief response to summary judgment, he said it started in 2013. And then on his deposition he said it started back in 2006. I think that there's plenty of evidence that he doesn't know when it started and if it was so severe or pervasive, you would think he would know pretty clearly when it started. His complaint, which is the controlling pleading here, states that it started in January of 2017. But his story changes all the time and his deposition testimony— It's a fact issue then. You could be impeached then on when did it really start. That's correct, but I think it goes to— Are there facts plaid? I'm going to ask again. Are there facts that show that it's sufficiently severe or that it is pervasive? Those are two different things. I would say in this case, no. Why? Explain why they don't rise to the level of either of those things. Because it did not affect a term or condition of his employment. That's a different thing. You want to negate it because it did not affect a condition. But I'm just asking you, are the facts plaid that it is sufficiently severe? And then I'm going to ask pervasive. Break it down. No, I would disagree that they are sufficiently severe or pervasive. I think that there's nothing in the record that would indicate that these racial slurs— You're saying racial slurs on a daily basis are not sufficiently severe or pervasive. No. That's under our circuit law. This court has held that racial slurs on a daily basis have not been severe or pervasive enough to constitute a hostile work— Now, what case says that? Daily racial slurs is not severe or pervasive? I mean, I could find some case law and submit it to the court, and I'm sure it's my brief. But as far as severe or pervasive, there's case law out there that— We certainly have cases that say a random racial slur isn't enough, although it's terrible, don't get me wrong. Right. But it's not enough. But we're asking about daily. From coworkers. What case says daily, constant racial slurs aren't enough to be severe or pervasive? I don't know that there's any case that's on point with when there is no clear identifying start date to when these racial slurs occurred, based on the plaintiff's own pleadings and his deposition testimony and affidavits. It's constantly changing. How do you distinguish this case from our en banc precedent in EEOC v. Bowe Brothers? In what regard? The daily taunts of the coworkers in that case was enough to overcome all the defenses. Your Honor, I think it's disputed whether or not they were— For summary judgment. It's a dispute. So it can overcome for summary judgment, but we don't know what happens at trial. I think it's controlling that it has to affect a term or condition of his employment, and it did not. Okay. So that's the whole thing. That is my argument, Your Honor. Do you have anything else? No, I was waiting to see if you had any other questions. Okay. Thank you. Thank you. We have your argument. Do you have any rebuttal? I just went out of time by listening. Okay. Well, then you have time. I just wanted to point out a couple of things from the record. Judge Southwick had asked about whether the supervisor and the vice president had talked to one another before the termination. There is evidence of that on page 235 and 236 in the record that they did talk beforehand. And also as to the question of whether this harassment affected a term or condition of his employment, Mr. Melvin said in his affidavit that it did in fact cause him to quit working on Saturdays because he just couldn't handle that anymore, but he continued to work during the week because he needed a job. So in addition to the other points that Judge Hayes raised, I would just point out he quit working on Saturdays due to that harassment. Because he didn't want to experience that on Saturdays? Correct. Correct. Thank you. Thank you. We have your argument. This case is submitted. We appreciate the arguments of counsel.